UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

T.E., individually and on behalf of C.E., a
minor,

                                                                    Plaintiff,

v.                                              Civil Action No. 3:22-cv-202-DJH-LLK

ANTHEM BLUE CROSS AND BLUE
SHIELD et al.,

                                                                    Defendants.

* * * * *

**MEMORANDUM OPINION AND ORDER**

Plaintiff T.E., individually and on behalf of a minor, C.E., sued Defendants Anthem Blue

Cross and Blue Shield, Stoll Keenon Ogden (SKO), and Stoll Keenon Ogden PLLC Benefit Plan

(the Plan), asserting claims under the Employee Retirement Income Security Act of 1974 (ERISA)

and the Mental Health Parity and Addiction Equity Act (the Parity Act) after Anthem "denied

claims for payment of C.E.'s medical expenses." (Docket No. 2, PageID.3 ¶ 7,14–21) Each party

now moves for summary judgment. (D.N. 87; D.N. 89) After careful consideration, the Court

will deny T.E.'s motion for summary judgment and grant the defendants' motion for summary

judgment for the reasons explained below.

**I.**

T.E., through his employer, SKO, was a participant in the Plan administered by Anthem.

(D.N. 89-1, PageID.3068 ¶ 4; D.N. 63, PageID.350) T.E.'s son, C.E., was a beneficiary of the

Plan. (D.N. 89, PageID.3051) In his youth, C.E. was diagnosed with attention

deficit/hyperactivity disorder, generalized anxiety disorder, and mood disorder. (D.N. 63-1,

PageID.791) At the age of thirteen, C.E. began to show "aggression and behavioral issues at

home." (*Id.*, PageID.834) C.E.'s parents decided to place him in an outpatient mental-health

1

treatment program at Our Lady of Peace Hospital on January 16, 2020. (*Id.*, PageID.832–34) He was discharged on February 5, 2020, after his treatment "show[ed] some improvement in target symptoms," and his condition at discharge was "[p]leasant" and "cooperative." (*Id.*) Shortly thereafter, on February 19, 2020, C.E.'s parents sought medical care and treatment for him at Elevations, an inpatient, residential treatment center. (*Id.*, PageID.703; D.N. 63, PageID.516–17)

Pursuant to the Plan, Anthem approved coverage of C.E.'s treatment at Elevations from February 19, 2020, to March 10, 2020. (D.N. 63, PageID.516) On March 13, however, Anthem informed T.E. that C.E.'s treatment at Elevations was not covered because it was not "medically necessary." (*Id.*, PageID.525–26) The letter from Anthem to C.E. stated:

> The review showed that what you've requested is Not Medically Necessary . . . . The plan clinical criteria consider[] ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have reports your condition remains improved, you remain safe, you rem[ain] medically stable, you have support, family session has been completed, and it does not show you are a danger to yourself or others. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

(*Id.*, PageID.525–26)

Notwithstanding the denial, C.E. continued to receive treatment at Elevations until October 2, 2020. (D.N. 63, PageID.658) During that time, C.E. was argumentative with staff and peers and refused directions from staff. (D.N. 63-1, PageID.728, 730, 732–33, 735) On April 18, a nurse progress note stated that C.E. was "placed in a safety hold" because he "hit[] [his] head

2

around 25 times" against a window.  (*Id.*, PageID.740–41)  Around a week later, on April 24, a progress report for the week stated that C.E. "advocated to go to the quiet room to get therapeutic pressure and began hitting his head against the wall."  (*Id.*, PageID.742)

T.E. appealed Anthem's determination twice.  (D.N.63-3, PageID.2011–15)  Each time, Anthem upheld its coverage denial, finding that C.E. was not eligible for coverage at a residential treatment facility.  (D.N. 63-3, PageID.2011–15)  Following the denial of the second appeal, T.E., individually and on behalf of C.E., sued Anthem, SKO, and the Plan, asserting claims under ERISA and the Parity Act.  (D.N. 2, PageID.14–21)  T.E. and the defendants each move for summary judgment.  (D.N. 87; D.N. 89)  T.E. has since withdrawn his 29 U.S.C. § 1132(a)(1)(A) and (c) claim seeking statutory penalties.  (D.N. 97, PageID.3242)

## II.

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see* 56(c)(1).  For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party.  *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The Court "need consider only the cited materials."  Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cnty.*, 743 F.3d 126, 136 (6th Cir. 2014).  If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed.  Fed. R. Civ. P. 56(e)(2)-(3).  To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23 (1986) (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").

"The fact that the parties have filed cross-motions for summary judgment does not mean . . . that summary judgment for one side or the other is necessarily appropriate." *Appoloni v. United States*, 450 F.3d 185, 189 (6th Cir. 2006) (quoting *Parks v. LaFace Recs.*, 329 F.3d 437, 444 (6th Cir. 2003)). Instead, "[w]hen reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Id.* (quoting *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003)).

## A. ERISA

T.E. first asserts claims under ERISA, 29 U.S.C. § 1132(a)(1)(B), seeking to recover benefits due for C.E.'s stay at Elevations. (D.N. 2, PageID.14) Federal "[d]istrict courts review an ERISA denial-of-benefits claim de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Kramer v. Am. Elec. Power Exec. Severance Plan*, 128 F.4th 739, 749–50 (6th Cir. 2025) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If the terms of the plan give the administrator or fiduciary "such discretion, then a court must review the administrator's denial of benefits under the arbitrary-and-capricious standard." *Id.* at 750 (quoting *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 546 (6th Cir. 2015)). Here, it is undisputed that the Plan grants the administrator discretion to determine eligibility for benefits under the Plan. (D.N. 87, PageID.3040; D.N. 89, PageID.3055; *see also* D.N. 89-1, PageID.3186 ("We, as the Claims Administrator, shall have all the powers necessary or appropriate to enable us to carry out our duties in connection with the operation of the Plan and interpretation of the Benefit

4

Booklet.")) Thus, the Court will analyze the alleged violation under the arbitrary-and-capricious standard. *Kramer*, 128 F.4th at 750.

The arbitrary-and-capricious standard is "extremely deferential." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014). Under this standard, "[a]n administrator's decision is not arbitrary or capricious 'if it is the result of a deliberate, principled reasoning process[,] supported by substantial evidence, and 'rational in light of the plan's provisions.'" *Kramer*, 128 F.4th at 750. This "test has two components": one procedural and one substantive. *Autran v. P&G Health & Long-Term Disability Ben. Plan*, 27 F.4th 405, 411 (6th Cir. 2022). "Procedurally, plan administrators must engage in reasoned decision[-]making," and "[s]ubstantively, plan administrators may reach only those conclusions that are supported by substantial evidence in the administrative record." *Id.* at 412. T.E. argues that the Plan's decision was both procedurally and substantively arbitrary and capricious. (*See* D.N. 87)

## 1.    Procedurally Arbitrary and Capricious

T.E. makes several arguments as to why the administrator's decision was procedurally arbitrary and capricious. First, he argues that the administrator selectively reviewed the evidence, ignoring favorable evidence from C.E.'s treating clinicians. (D.N. 87, PageID.3041) Specifically, T.E. contends that the Plan "ignored the letters submitted by C.E.'s treating clinicians opining that it was medically necessary for C.E. to be admitted and to continue receiving residential treatment at Elevations." (*Id.*) According to T.E., C.E.'s treating clinicians' opinions were significant because those clinicians "had actually seen and personally examined C.E." (*Id.*) T.E. further contends that the defendants did not offer evidence to support their denial of C.E.'s benefits under the policy. (*Id.*, PageID.3042) The defendants, on the other hand, argue that "[u]pon each of C.E.'s appeals, Anthem's clinical reviewer conducted a thorough review of the medical records

provided to Anthem and made a reasoned, informed decision to deny C.E.'s claim for services at Elevations because it was 'not medically necessary.'" (D.N. 89, PageID.3057)

"[P]lan administrators must engage in reasoned decision[-]making." *Id.* at 412. In determining whether an administrator's decision was procedurally arbitrary and capricious, courts evaluate whether the administrator considered all the evidence or instead engaged in a "selective review" of the administrative record. *Shaw*, 795 F.3d at 549. While administrators are not required to "accord special deference to the opinions of treating physicians," they cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 548 (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003)). If an administrator rejects the opinions of a treating physician, it may not do so "summarily" but "must instead give reasons for adopting an alternative opinion." *Id.* at 548–49. "Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010).

In support of his argument that the denial of benefits was procedurally arbitrary and capricious, T.E. cites *Shaw*, 795 F.3d 538. In *Shaw*, the Sixth Circuit held that the administrator acted arbitrarily and capriciously in denying benefits, in part because the administrator "ignored favorable evidence submitted by [the plaintiff's] treating physicians" and "selectively reviewed the evidence it did consider from the treating physicians." *Id.* The administrator ignored favorable evidence by making conclusions which were negated by the plaintiff's medical records. *Id.* at 548. In addition, "[i]nstead of offering evidence to contradict [the treating doctor's] . . . conclusion," the "[p]lan's physician advisors simply ignored the [evaluation] and concluded that [the plaintiff] could perform sedentary work." *Id.* The administrator also selectively reviewed the treating physician's evidence by using an examination to support its conclusion that the plaintiff was not

6

disabled but ignoring other notes from that same evaluation that the plaintiff continued to have pain in his hand, arm, and neck. *Id.* at 549.

Administrators are deemed to have engaged in a complete review of the record when they offer a "reasoned" explanation for the denial and cite the treating physician's findings. For instance, in *Autran*, 27 F.4th 405, the Sixth Circuit held that the administrator did not "'totally ignore' the records from [the plaintiff's] treating physicians" because they "expressly cited them." *Id.* at 415 (quoting *Balmert*, 601 F.3d at 504). The court also found that the administrator properly "credit[ed] the opinions of the independent physicians over [the treating physician]" because it "relied on objective findings from examinations of the plaintiff." *Id.* at 416. In other words, "the objective evidence backed up the opinions" of the reviewing physicians. *Id.* Similarly, in *Avery v. Sedgwick Claims Management Services*, the Court held that the administrator did not "ignore and selectively review" the evidence because the insurer's physician advisors "engaged in a fulsome review of the record" and consulted the treating physicians. No. 22-1960, 2023 U.S. App. LEXIS 18860 (6th Cir. July 24, 2023). And although the administrator rejected the opinions of treating physicians, it based that rejection on the opinions of other doctors who conducted an independent review of medical records and documentation and "identified contrary evidence that cut against [the plaintiff's] claimed disability." *Id.* at 28.

Here, T.E. has failed to show that the denial of C.E.'s claim was procedurally arbitrary and capricious. Like the administrator in *Autran*, the Plan did not "totally ignore" records from C.E.'s treating physicians, because it "expressly cited them." 27 F.4th at 415. For instance, one reviewer cited to page numbers of the medical record and cited an evaluation by C.E.'s treating psychologist, Elizabeth Manley. (D.N. 63-3, PageID.2014 ("On page 260 of the records is said that . . . .")) The second appeal reviewer likewise stated that "[n]otes and 662 pages of records were reviewed."

(*Id.*, PageID.2012)  The reviewers also noted that they considered evidence favorable to C.E., including C.E.'s argumentative and aggressive characteristics, difficulty staying on or completing tasks, anxiety, low self-esteem, and sensory issues.  (*Id.*, PageID.2014)  The administrator thus did not "totally ignore" C.E.'s medical or treating physicians' records.  *Autran*, 27 F.4th at 415.

The administrator also did not "selectively review" the evidence.  As an initial matter, unlike *Shaw*, the denial here did not make statements that are directly contradicted by a treating physician's conclusions.  *See* 795 F.3d at 547.  Moreover, as previously noted, the administrator considered evidence that was unfavorable to denial and favorable to C.E.  (*Id.*, PageID.2014)  Although the administrator ultimately rejected the treating physician's opinion that C.E. should "stay longer in residential treatment center care" (D.N. 63-3, PageID.1995), the "administrator need only offer 'reasons for adopting an alternative opinion' to survive arbitrary and capricious review."  *Avery*, 2023 U.S. App. LEXIS 18860, at *26 (quoting *Shaw*, 795 F.3d at 549).  The administrator did so here: it reasoned that C.E. was not at risk for serious harm justifying 24-hour care because recent medical evaluations stated that C.E. denied auditory or visual hallucinations, suicidal ideation, or homicidal ideation; that C.E. did not display psychosis or mania; "that [C.E.'s] sleep and appetite [were] adequate"; and that he had "no medication side effects."   (D.N. 63-3, PageID.1995)  The administrator noted that C.E.'s psychologist, Jill Manley, stated that C.E. "would benefit from a small[,] specialized classroom to work on social skills[,] perspective talking[,] and flexibility," as well as minimized sensory stimulation "so that he is able to best comprehend and integrate new information."  (*Id.*)  The objective evidence in C.E.'s medical records therefore "back[s] up the opinions of the independent physicians" that 24-hour care was not medically necessary.  *Autran*, 27 F.4th at 416; *cf. Shaw*, 795 F.3d at 548.

## 2.     Substantively Arbitrary and Capricious

Next T.E. argues that the administrator's denial is substantively arbitrary and capricious. (D.N. 87, PageID.3042–43)  The Plan covers "Mental Health" services, including residential treatment,[1] when "medically necessary."  (D.N. 63, PageID.378–79, 382, 403)  Services are not "medically necessary" when, after reviewing the "level of care, setting[,] or place of service," the administrator determines that those services "can be safely given to [the patient] in a lower level of care or lower cost setting/place of care."[2]  (D.N. 63, PageID.382)  "The fact that a Provider may prescribe, order, recommend, or approve care, treatment, services or supplies does not, of itself, make such care, treatment, services or supplies [m]edically [n]ecessary or a Covered Service and does not guarantee payment."  (D.N. 63, PageID.471 (emphasis removed))  To determine whether behavioral-health treatment is "medically necessary" at a residential treatment center, the Plan uses the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES) (the MCG Guidelines).  (*See* D.N. 63-3, PageID.2014–15; D.N. 63-4, PageID.2736)  The MCG Guidelines state that once a patient receives residential treatment, "[c]ontinued residential care is generally needed until" a "[p]atient or guardian refuses treatment"; a "[h]igher level of care is indicated"; or "[r]esidential care is no longer necessary due to adequate patient stabilization or improvement as indicated by **ALL** of the following:

> [1] Risk status acceptable as indicated by **ALL** of the following:
>> [a] Danger to self or others manageable as indicated by **1 or more** of the following:

---

[1] The Plan defines residential treatment as treatment "in a licensed Residential Treatment Center that offers individualized and intensive treatment and includes: [a] [o]bservation and assessment by a physician weekly or more often, [and] [b] [r]ehabilitation, therapy, and education."  (D.N. 63, PageID.403)

[2] The Plan provides a few examples of when services would not be medically necessary, including that "[a] service may be denied on an inpatient basis at a Hospital but may be approvable if provided on an outpatient basis at a Hospital."  (D.N. 63, PageID.382)

[1] Absence of Thoughts of suicide, homicide, or serious Harm to self or to another, [or]

[2] Thoughts of suicide, homicide, or serious Harm to self or to another present but manageable at available lower level of care

[b] Patient and supports understand follow-up treatment and crisis plan.

[c] Provider and supports are sufficiently available at lower level of care.

[d] Patient, as appropriate, can participate as needed in monitoring at available lower level of care.

[2] Functional status acceptable as indicated by **1 or more** of the following:

[a] No essential function is significantly impaired.

[b] An essential function is impaired, but impairment is manageable at available lower level of care.

[3] Medical needs absent or manageable at available lower level of care as indicated by **ALL** of the following:

[a] Adverse medication effects absent or manageable

[b] Medical comorbidity absent or manageable

[c] Medical complications absent or manageable (eg, complications of eating disorder)

[d] Substance-related disorder absent or manageable

[4] Treatment goals for level of care met.

(D.N. 63-4, PageID.2804–05)

T.E. does not argue that the MCG Guidelines are not generally accepted standards of care; rather, he argues that "C.E.'s condition did not meet the MCG Guideline's criteria for discharge from residential treatment as of March 11, 2020." (D.N. 87, PageID.3042) T.E. contends that the Plan's denial was substantively arbitrary and capricious because it focused on only one criterion for denial—that C.E. did not pose a danger to himself—but C.E. had engaged in self-harm. (D.N. 87, PageID.3042–43) Specifically, T.E. cites evidence in C.E.'s records that C.E. engaged in head-banging and "had to be placed in physical holds for his safety" twice in April 2020. (*Id.*, PageID.3042) T.E. also contends that C.E.'s "functional status" was not "acceptable" because "C.E.'s significant impairments to his essential functions were not manageable at a lower level of care as of March 11, 2020." (*Id.*, PageID.3043) According to T.E., these impairments "were barely manageable at Elevations—for months after that date[,] C.E. consistently refused to do schoolwork, refused to follow instructions, antagonized both peers and Elevations staff and refused

10

to be redirected or to regulate himself, and self-harmed until he needed to be restrained."[3] (*Id.*) T.E. also contends that the "treatment goals for level of care" were not met (D.N. 87, PageID.3044) because C.E.'s psychologist at Our Lady of Peace Hospital, Jill Engle, stated that "the only criterion that should be considered for [C.E.'s] insurance termination . . . should center around his no longer making progress in his impulse control, explosive[,] or dangerous outbursts." (D.N. 63-1, PageID.968)  The defendants, on the other hand, maintain that the denial was "supported by substantial evidence" and "based on the plain language of the Plan that denies coverage for the continued treatment sought by [T.E.] at Elevations." (D.N. 89, PageID.3057–59)

"[P]lan administrators may reach only those conclusions that are supported by substantial evidence in the administrative record." *Autran*, 27 F.4th at 412.  "Substantial evidence" means that "a rational person could conclude that the evidence was 'adequate' to justify the decision." *Id.*  If the record contains evidence that could support either party's position, "the administrator's choice between this conflicting evidence cannot be considered arbitrary on substantive grounds." *Id.*  The Court generally must "consider only the evidence available to the administrator at the time the final decision was made." *Avery*, 2023 U.S. App. LEXIS 18860, at *23 (quoting *Shaw*, 795 F.3d at 547).

Based on the information available to the administrator at the time of its decisions, a reasonable person could conclude that treatment at Elevations was not "medically necessary" because C.E. could have obtained care at an outpatient facility.  The administrator's decision was based on recent medical records finding that C.E. denied suicidal or homicidal ideation; denied

---

[3] The only evidence cited by T.E. here are letters by doctors in support of C.E.'s current treatment. (*See* D.N. 87, PageID.3043)  Those letters do not cite instances of self-harm.  (*See* D.N. 63-1, PageID.965–69)  The only other evidence of self-harm cited to in the briefing are the two instances of head-banging.  (D.N. 87, PageID.3042–43)

11

auditory or visual hallucinations; had "no psychosis or evidence of thought disorder"; had "cooperative" behavior and mood; had "[f]air concentration"; was "able to remain on task"; had judgment "intact"; and "underst[ood] mental illness." (D.N. 63-4, PageID.2748) The reviewer, Dr. Shah, thus concluded that "[u]nderlying issues have been explored" and treatment "has focused on both stabilizing presenting signs and symptoms" and "addressing the underlying issues." (*Id.*)

A grievance and appeal analyst, Shannon, also noted that C.E.'s "sleep and appetite [were] adequate," he had "no medication side effects," and "[a]n evaluation by Elizabeth Manley, PsyD on 3/16—[3/19/2020] indicated that [C.E.] would benefit from a small[,] specialized classroom to work on social skills[,] perspective taking[,] and flexibility" and minimized sensory stimulation. (*Id.*, PageID.2745) The denial of coverage was affirmed on appeal twice by Anthem. First, Dr. Fisher similarly determined that residential treatment was not medically necessary and that C.E. "could have been treated with outpatient services." (*Id.*, PageID.2742) A second doctor, Dr. Klaehn, concluded the same, finding that C.E.'s medical records "d[id] not show the need acuity for continued stay" at Elevations. (*Id.*, PageID.2741) Thus, at least three reviewing doctors concluded that residential treatment was not "medically necessary." *See Avery*, 2023 U.S. App. LEXIS 18860, at *34 ("[N]o fewer than four physicians concluded that Avery is no longer totally disabled. If this did not amount to 'a reasonable explanation for the administrator's decision,' it would be difficult to say what would.").

Although C.E. engaged in head-banging, which may be indicative of self-harm, T.E. cites only two instances of head-banging during C.E.'s six-month stay at Elevations, and there is no suggestion that any thoughts of self-harm were not manageable at an outpatient treatment facility. (*See* D.N. 87) Moreover, although the record supports T.E.'s contention that C.E.'s functional status was impaired because "C.E. consistently refused to do schoolwork, refused to follow

instructions, antagonized both peers and Elevations staff[,] and refused to be redirected or to regulate himself" (*id.*, PageID.3043), this again does not conflict with the reviewing physicians' finding that 24-hour care at a *residential* treatment was not "medically necessary" and that treatment could have been provided by an outpatient facility. *Autran*, 27 F.4th at 412. And while, as noted by T.E., C.E. did not "extinguish[] or replace" his "maladaptive/dangerous behaviors" with more "adaptive behaviors," and he engaged in head-banging, this does not mean that his treatment goals were not met. (D.N. 87, PageID.3043–44) Simply "[t]hat [T.E.] disagrees with the administrator's findings does not make them arbitrary or capricious." *Kramer*, 128 F.4th at 750.

Because the record contains evidence that could support either party's position, "the administrator's choice between this conflicting evidence cannot be considered arbitrary on substantive grounds." *Autran*, 27 F.4th at 412. Therefore, the Plan's denial of coverage was not arbitrary and capricious, and the defendants are entitled to summary judgment on this count. *Id.*

## B.  Parity Act

Next, T.E. alleges that the defendants violated the Parity Act by using "more stringent or restrictive" criteria for mental-health treatment benefits than "analogous intermediate levels of medical or surgical benefits." (D.N. 2, PageID.15–16) The Parity Act "prohibits insurance companies from imposing less favorable coverage limitations on 'mental health benefits' than it does for 'medical [or] surgical benefits.'" *Wilson v. Anthem Health Plans of Ky., Inc.*, No. 3:14-CV-743-TBR, 2017 U.S. Dist. LEXIS 572, at *21 (W.D. Ky. Jan. 3, 2017) (quoting 42 U.S.C. § 300gg-26). Plaintiffs may assert Parity Act claims through 29 U.S.C. § 1132(a)(3). *See N.R. ex rel. S.R. v. Raytheon Co.*, 24 F.4th 740, 749 (1st Cir. 2022); *see also Wilson v. Anthem Health Plans of Ky., Inc.*, No. 3:14-CV-743, 2017 U.S. Dist. LEXIS 572, 2017 WL 56064, at *2 (W.D.

Ky. Jan. 4, 2017) ("Congress enacted [the Parity Act] as an amendment to ERISA, making it enforceable through a cause of action under 29 U.S.C. § 1132(a)(3)." (quoting *Joseph F. v. Sinclair Servs. Co.*, 158 F. Supp. 3d 1239, 1259 n.118 (D. Utah 2016)).  Section 1132(a)(3) provides that

> [a] civil action may be brought . . . by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan.

29 U.S.C. § 1132(a)(3).

Plaintiffs "may challenge treatment limitations either facially or as applied."  *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1284 (10th Cir. 2023).  While a "facial challenge focuses on the terms of the plan," an "as-applied challenge focuses on treatment limitations that a plan applies 'in operation.'"  *Id.* (quoting 29 C.F.R. § 2590.712(c)(4)(i)).  T.E. makes only an as-applied challenge here.  (*See* D.N. 97, PageID.3241 ("[T.E.] is not alleging that Anthem's criteria are disparate, but that its application of the criteria is [disparate].""))

The Sixth Circuit has not yet addressed the elements for establishing a Parity Act claim.  This Court previously applied a three-part test in this case (D.N. 57, PageID.5–6), and the parties agree that it applies here.  (D.N. 87, PageID.3045; D.N. 89, PageID.3059–60).  Under this three-part test, plaintiffs must:

> (1) identify a specific treatment limitation on mental health benefits, (2) identify medical/surgical care covered by the plan that is analogous to the mental health/substance abuse care for which the plaintiffs seek benefits, and (3) plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog.

*James C. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-38, 2021 WL 2532905, at *18 (D. Utah June 21, 2021) (citing *Nancy S. v. Anthem Blue Cross & Blue Shield*, No. 2:19-CV-00231-JNP-DAO, 2020 WL 2736023, at *3 (D. Utah May 26, 2020)); *see also E.W.*, 86 F.4th 1282

("More recently, district courts in this Circuit have transitioned to a three-part test."). The defendants dispute only the second and third requirements here. (D.N. 89, PageID.3059–60)

Assuming that "[s]killed nursing facilities, subacute inpatient rehabilitation facilities, and inpatient hospice facilities are medical/surgical analogues to residential [mental-health] treatment facilities like Elevations," as T.E. asserts (D.N. 87, PageID.3045), T.E.'s Parity Act claim nonetheless fails because he has not met the third requirement. T.E. argues that Anthem's "denial letters after each of [T.E.'s] appeals misapplied the MCG Guidelines's discharge criteria when they focused on only one criterion that they argued C.E. met—whether C.E.'s danger to himself or others was 'manageable'—and ignored the criteria that C.E. did not meet." (D.N. 87, PageID.3045) Therefore, T.E. argues that the defendants applied a greater "limitation to the residential mental health treatment C.E. received at Elevations than they would to analogous medical/surgical treatment because [the d]efendants misapplied the MCG Guidelines rather than allow themselves to be 'guided by' the 'clinical criteria' as they admit they do with skilled nursing, subacute inpatient rehabilitation, and inpatient hospice facilities." (D.N. 87, PageID.3046) In response, the defendants contend that T.E.'s argument "misses the mark because Anthem considered all relevant criteria in its evaluation of C.E.'s claims" and there is no evidence that Anthem failed to apply the limitations equally. (D.N. 89, PageID.3060–61)

T.E. fails to "plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *James C.*, 2021 WL 2532905, at *18. As an initial matter, T.E. does not argue that the MCG Guidelines are more restrictive than the requirements for analogous medical or surgical care. (*See* D.N. 87, PageID.3045) Rather, T.E. argues that Anthem's *misapplication* of these guidelines created the treatment limitation. (*Id.*) But T.E. offers no

15

evidence that Anthem misapplied the MCG Guidelines by focusing solely on "whether C.E.'s danger to himself or others was 'manageable'" and "ignored the criteria that C.E. did not meet." (D.N. 87, PageID.3045)  As discussed above, Anthem did not "totally ignore" favorable evidence for C.E.  *See Balmert*, 601 F.3d at 504.  The denial of coverage acknowledged that C.E. "suffers with ADHD," anxiety disorder, sensory issues, and low self-esteem; "has difficulty staying on task" and completing tasks; is "argumentative," "verbally aggressive," and "easy to anger"; and is "dishonest"  (D.N. 63-4, PageID.2748)  It nonetheless ultimately concluded that, given the other evidence in C.E.'s medical records, residential treatment was not medically necessary and the MCG Guidelines were not met.  (*Id.*, PageID.2748, 2761–62)  T.E. offers no evidence that Anthem and its reviewers did not fully consider the MCG Guidelines or the "medically necessary" criteria. (*See* D.N. 87)  The mere fact that the reviewing physicians identified evidence that C.E.'s danger to himself or others was manageable does not mean that the reviewers only considered C.E.'s danger to himself or others under the MCG Guidelines.  *See Kirsten W. v. Cal. Physicians Serv.*, No. 2:19-cv-00710-DBB-JCB, 2025 U.S. Dist. LEXIS 24544, at *51 (D. Utah Feb. 10, 2025).

Moreover, although Anthem reviews the MCG Guidelines in determining the medical necessity of residential treatment and different guidelines are used for skilled nursing, subacute inpatient rehabilitation, and inpatient hospice (*see* D.N. 87, PageID.3045–56), "the guidelines do not need to be identical, just comparable."  *L.D. v. UnitedHealthcare Ins.*, 684 F. Supp. 3d 1177, 1206 (D. Utah 2023).  But T.E. does not allege that these guidelines are not comparable.  (*See* D.N. 87)  Therefore, T.E. has failed to "plausibly allege a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations" to the medical or surgical analog.  *James C.*, 2021 WL 2532905, at *18.  Therefore, T.E. has failed to establish a Parity Act

violation, and the Court will grant summary judgment in favor of the defendants on this claim. *See James C.*, 2021 WL 2532905, at *18.

### III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    T.E.'s motion for summary judgment (D.N. 87) is **DENIED**.

(2)    The defendants' motion for summary judgment (D.N. 89) is **GRANTED**.   A separate Judgment will be entered this date.

March 29, 2025

**David J. Hale, Judge**
**United States District Court**